UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

BANQUE PICTET & CIE SA,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CRIM 631**

**INFORMATION**

**23 Cr.**

## COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Banque Pictet et Cie SA

1. Founded in 1805, Banque Pictet & Cie SA (together with all of Pictet's subsidiaries, branches, affiliates, representative offices, and predecessors in interest, "the Pictet Group") is a privately held Swiss financial institution, headquartered in Geneva, that has historically operated as a general partnership and, since 2014, as a corporate partnership. The Pictet Group is owned and managed by a limited number of partners ("Managing Partners"), generally no more than eight at a time, known colloquially as "The Salon." The Pictet Group operates two main business divisions: institutional asset management and private banking for individuals. The conduct described in this Information occurred from 2008 through 2014 (hereinafter, the "Relevant Period") and concerns the Pictet Group's private banking division.

2. During the Relevant Period, the private banking division was operated by the following banking entities of the Pictet Group: the Swiss bank (Banque Pictet & Cie SA) and its affiliates, Pictet & Cie (Europe) SA headquartered in Luxembourg, Bank Pictet & Cie (Asia) Ltd in Singapore, and the Bahamian bank, Pictet Bank & Trust Ltd. Pictet provided offshore corporation and trust formation and administration services to certain U.S. taxpayers, first through the Estate Planning and Trust Services unit and later through a wholly owned subsidiary called Rhone Trust and Fiduciary Services SA ("Rhone"). Certain trustee services were provided by Rhone Trustees (Bahamas) Ltd., Rhone Trustees (Singapore) Ltd., and Rhone Trustees (Switzerland) SA—all subsidiaries of Rhone.

3. During the Relevant Period, the Pictet Group's private banking division served private clients from around the world, including U.S. citizens and residents ("U.S. taxpayer-clients"), among them U.S. taxpayer-clients located in the Southern District of New York. Some U.S. taxpayer-clients were advised by client relationship managers employed by the Pictet Group directly. Other U.S. taxpayer-clients were advised by external asset managers for which the Pictet Group provided predominantly administrative and custodial services.

### Obligations of U.S. Taxpayers
### With Respect to Foreign Financial Accounts

4. At all times relevant to this Information:

   a. U.S. citizens and residents who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the Internal Revenue Service ("IRS"). On the Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts.

b. U.S. taxpayers also had an obligation to report to the IRS on Schedule B of the Form 1040 whether they had a financial interest in, or signature authority over, a financial account in a foreign country during the relevant calendar year by checking "Yes" or "No" in the appropriate box and identifying the country where such account was maintained.

c. In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the Department of Treasury a Report of Foreign Bank and Financial Accounts, FinCEN Form 114 (the "FBAR," formerly known as Form TD F 90-22.1) on or before June 30 of the following year. In general, the FBAR required that the U.S. taxpayer filing the form identify the financial institution with which the financial account was held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR was being filed.

d. The regulations relating to the required disclosure of foreign bank accounts specifically precluded U.S. taxpayers from having foreign accounts nominally held by sham corporate structures as a means of avoiding disclosure. Specifically, as set forth in Title 31, Code of Federal Regulations, Section 1010.350(e)(3):

> A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section [requiring generally the disclosure of offshore financial accounts containing over $10,000 and over which a U.S. taxpayer has signature or other authority] shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

5. As used in this Information, "undeclared account" refers to a financial account held or beneficially owned by an individual subject to U.S. tax obligations and

3

maintained in a foreign country that has not been reported by the individual account holder or beneficial owner to the U.S. government on a Form 1040 or FBAR as required.

## Overview of the Conspiracy

6. From at least in or about January 2008 up through and including in or about December 2014, numerous U.S. taxpayer-clients conspired with the Pictet Group, the defendant, and others known and unknown, to defraud the United States, to conceal from the IRS the existence of bank accounts held by U.S. taxpayer-clients at the Pictet Group and the income earned in these accounts, to file false tax returns, and to evade U.S. taxes on income generated in the undeclared accounts. During the Relevant Period, the Pictet Group conspired with U.S. taxpayer-clients to hide, at their peak in January 2008, approximately $5.6 billion in aggregate maximum assets from the IRS in undeclared accounts at the Pictet Group.

## Means and Methods of the Conspiracy

7. Among the means and methods by which the Pictet Group, the defendant, and its co-conspirators carried out the conspiracy were the following:

  a. The Pictet Group opened and managed accounts for U.S. taxpayer-clients at the Pictet Group that were not reported to the IRS on Forms 1040, FBARs, or otherwise, and the income from which was also not reported to the IRS.

  b. The Pictet Group opened and maintained "numbered" or "pseudonym" accounts for U.S. taxpayer-clients to ensure that the U.S. taxpayer-clients' names would not appear on bank documents relating to their accounts and thereby reduce the risk that U.S. tax authorities would learn the identities of the U.S. taxpayer-clients.

4

c. The Pictet Group assisted U.S. taxpayer-clients in opening and maintaining undeclared accounts held in the names of sham entities, that is, structures that had no business purpose, in order to conceal the U.S. taxpayer-clients' beneficial ownership of the account assets.

d. The Pictet Group agreed to hold bank statements and other records relating to accounts of U.S. taxpayer-clients in Switzerland and elsewhere, rather than send them to the U.S. taxpayer-clients in the United States, which helped ensure that documents reflecting the existence of the accounts remained outside the United States and beyond the reach of U.S. tax authorities.

e. The Pictet Group allowed U.S. taxpayer-clients and third-party asset managers to make structured withdrawals from undeclared accounts in amounts of less than $10,000, in an attempt to conceal the transactions from U.S. authorities.

f. The Pictet Group offered its U.S. taxpayer-clients stored-value debit cards issued by an independent service provider, which allowed U.S. taxpayer-clients to use the funds in their undeclared accounts at the Pictet Group.

g. The Pictet Group permitted several U.S. taxpayer-clients to make deposits into undeclared accounts through intermediaries.

h. On occasion, the Pictet Group opened accounts for U.S. taxpayer-clients who were exiting UBS and other Swiss banks as a result of U.S. criminal investigations and allowed these U.S. taxpayer-clients to continue to conceal their undeclared assets at the Pictet Group.

i. The Pictet Group helped U.S. taxpayer-clients to repatriate funds to the United States in a manner designed to ensure that U.S. authorities did not discover these undeclared accounts.

j. The Pictet Group opened and maintained Private Placement Life Insurance ("PPLI") policy accounts (colloquially known as "insurance wrappers"), held in the name of non-U.S. insurance companies, including Swiss Life, but beneficially owned by U.S. taxpayers and improperly managed or funded through undeclared accounts at the Pictet Group.

k. Various U.S. taxpayer-clients of the Pictet Group, including taxpayer-clients in Manhattan, filed false Forms 1040 that failed to report their interest in, and income earned from, their undeclared Pictet Group accounts; evaded income taxes due and owing to the IRS; and failed to file FBARs identifying their undeclared accounts.

## Statutory Allegations

8. From at least in or about January 2008 up through and including in or about December 2014, in the Southern District of New York and elsewhere, the Pictet Group, the defendant, together with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7206(1) and 7201.

9. It was a part and an object of the conspiracy that the Pictet Group, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS by impeding, impairing, obstructing, and

defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

10. It was further a part and an object of the conspiracy that various U.S. taxpayer-clients of the Pictet Group, the defendant, together with others known and unknown, willfully and knowingly would and did make and subscribe income tax returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which these U.S. taxpayer-clients, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

11. It was further a part and an object of the conspiracy that the Pictet Group, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America by certain of the Pictet Group's U.S. taxpayer-clients, in violation of Title 26, United States Code, Section 7201.

## Overt Acts

12. In furtherance of the conspiracy and to effect the illegal objects thereof, the Pictet Group, the defendant, and others known and unknown, including certain Pictet Group Managing Partners and private bankers acting within the scope of their employment with the Pictet Group, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about October 2008, as part of the "W-9 or Leave" Program, which required U.S. resident clients to provide IRS Forms W-9, a form that identifies an

individual as a U.S. taxpayer for U.S. tax purposes, or leave the Pictet Group, it transferred a U.S. taxpayer-client's undeclared funds at her request to the account of her son, who was documented as a Greek national in the bank's systems but who also had U.S. citizenship, which was known to at least the relationship manager and the Pictet Group Managing Partner who introduced the U.S. taxpayer-client to the Pictet Group.

    b. On or about September 18, 2009, a Pictet Group relationship manager confirmed to a Swiss Life employee that new accounts had been opened at the Pictet Group for the purpose of placing the funds of undeclared U.S. clients in insurance wrappers.

    c. In or about October 2009, the Pictet Group closed out the undeclared account of a U.S. taxpayer-client held in the name of a Panamanian corporation by transferring the funds to a Swiss Life (Singapore) insurance wrapper account at another Swiss bank.

    d. In or about November 2009, the Pictet Group funded an undeclared U.S. taxpayer-client's Swiss Life insurance wrapper policy with approximately $45 million in the U.S. taxpayer-client's undeclared funds, followed by approximately €35 million in undeclared funds for a second Swiss Life insurance wrapper policy.

    e. On or about November 9, 2009, a Pictet Group employee sent a confirmatory email to the principal of a Singapore Trust Company involved with the undeclared U.S. taxpayer-client identified in subparagraph 11(c) and a Swiss Life employee, stating, "In the absence of [a second Pictet Group employee] and on his request, please be informed that we received today the funds back (i.e. Eur 45 mio.) with value tomorrow."

8

    f.  In or about December 2009, a Pictet Group relationship manager met with an undeclared U.S. taxpayer-client in London to discuss the investment profile for their insurance wrapper policy accounts.

    g.  From approximately 2009 to 2013, the Pictet Group processed cash withdrawals by a U.S. taxpayer-client whose undeclared funds had moved from an account in his name into a new account at the Pictet Group held in the name of his non-U.S. spouse.

    h.  In or about July 2012, a Pictet Group employee requested that Swiss Life send a new Form I for an insurance wrapper account that did not include the name of the U.S. taxpayer-client policyholder.

    i.  On or about October 4, 2012, the Pictet Group paid a partial surrender of $500,000 to a Swiss Life (Singapore) Pte Ltd U.S. taxpayer-client policyholder's Panamanian entity account at a bank in Panama.

    j.  In or about April 2014, a Pictet Group employee emailed a Swiss Life employee about the opening of an insurance wrapper account for a U.S. taxpayer-client. The Pictet Group employee stated that the policy holder's name should not be mentioned "[b]ecause the contracting partner is Swiss Life, and as such Swiss Life is doing the KYC for the underlying Client. That bank's Client is Swiss Life, and the policyholder is Swiss Life's Client.

The bank does not require to know the Client name, and does not wish to know it. I am sorry, but I require a new Form I without the Client name, as per my initial email." This was so even though Swiss Life had informed the Pictet Group that the policyholder had authorized the disclosure.

(Title 18, United States Code, Section 371.)

DAMIAN WILLIAMS
United States Attorney